## Commonwealth *v.* Ellsworth, Appellant.

Argued October 1, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*John Rogers Carroll,* with him *Robert E. Gabriel,* for appellant.

*Charles Jay Bogdanoff,* Assistant District Attorney, with him *Joseph M. Smith,* Assistant District Attorney, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, March 22, 1966:

Frank Ellsworth was indicted by the grand jury of Philadelphia County for the felony murder of one Lulubel Rossman which had taken place on July 3, 1955. He was tried before a court and jury, convicted of murder of the first degree and sentenced to life imprisonment. We reversed that judgment of sentence and granted a new trial because of error on the part of the trial court in admitting into evidence certain declarations made by one Raymond Wilson, an alleged co-conspirator of Ellsworth, to a third party, in Ellsworth's absence and against Ellsworth, after the conspiracy had terminated (*Commonwealth v. Ellsworth,* 409 Pa. 505, 187 A. 2d 640). Upon his second trial before a court and jury, Ellsworth was again convicted of murder in the first degree and sentenced to life imprisonment. Subsequent motions for a new trial and

arrest of judgment were overruled by the Court of Oyer and Terminer of Philadelphia County. From the judgment of sentence this appeal was taken.

"On July 4, 1955, Lulu Rossman, a 76 year old widow, was found dead in a hotel room in Philadelphia. Her death was due to a strangulation which occurred during the course of a robbery and the time of her death was fixed as the early evening of July 3, 1955. From her killing arose the events which later culminated in the arrests and subsequent convictions at separate trials, of Raymond Wilson, R. W. Thomas, Gus DeMoss and Frank Ellsworth . . . of murder in the first degree with the penalty fixed at life imprisonment.": *Commonwealth v. Ellsworth*, 409 Pa. 505, 506, 507, supra.[1]

For the purpose of this appeal, we deem the following recitation of facts sufficient. It was the contention of the Commonwealth that Thomas, DeMoss, Ellsworth and Wilson, knowing that Mrs. Rossman was accustomed to carry on her person or have in her apartment large sums of money, conspired to rob her; that it was Ellsworth and Wilson who actually robbed and killed Mrs. Rossman; that, with the stolen money, most of which was in new $100 bills, in their possession, Ellsworth and Wilson then flew to Las Vegas, Nevada, via the circuitous route of Tampa, Florida, and Tulsa, Oklahoma. During the night of July 6, 1955—three days after the alleged robbery and homicide—the activities of Ellsworth and Wilson, then engaged in making the

---

[1] Judgments of sentence against Ellsworth's three alleged co-conspirators were affirmed on appeal to this Court: *Commonwealth v. Wilson*, 394 Pa. 588, 148 A. 2d 234, cert. den. 361 U.S. 844, 80 S. Ct. 97; *Commonwealth v. DeMoss*, 401 Pa. 395, 165 A. 2d 14, cert. den. 365 U.S. 822, 81 S. Ct. 708; *Commonwealth v. Thomas*, 410 Pa. 160, 189 A. 2d 255, cert. den. 375 U.S. 856, 84 S. Ct. 118. The entire factual background of this homicide is described at length in *Commonwealth v. Wilson*, supra, and *Commonwealth v. DeMoss*, supra.

rounds of the gambling casinos in Las Vegas, aroused the curiosity of several of the security officers in the various gambling clubs.[2] Ellsworth and Wilson, very shabbily dressed, were buying gambling chips with new $100 bills and, after a brief time spent at the dice tables, were cashing their chips and moving on to another casino. Believing that they were engaged in exchanging counterfeit money for "clean money",[3] the security officers of the Sahara Hotel and the Dunes Hotel alerted the local police and the Federal Bureau of Investigation to watch and observe the activities of Ellsworth and Wilson; both police agencies responded by placing the two men under constant surveillance. The officers assigned to this task noticed immediately that Ellsworth and Wilson were pretending to be unacquainted by leaving a casino separately although rejoining each other a short distance from the establishment which they had left. At the Las Vegas Club, Ellsworth was observed purchasing $900 worth of chips with nine brand new $100 bills, all of "C" series with consecutive serial numbers.[4] After the club owner and its security officer had inspected the nine $100 bills and had satisfied themselves that they were not counterfeit, the owner directed the cashier to return to Ellsworth, when he cashed in his chips, the same bills that he had given the cashier when he purchased the chips. Shortly thereafter, Ellsworth handed to the

---

[2] The following events are not disputed by defendant.

[3] In the Las Vegas gambling casinos, the money which is taken by the cashier for the purpose of chips is kept separate and apart from the money which is returned to the gambler when his chips are cashed in. In this manner, a person could dispose of counterfeit or traceable currency in return for "clean" or untainted money.

[4] $100 bills in U.S. currency of "C" series (i.e., C-00323537A) had been issued in May, 1955, by the Federal Reserve Bank of Philadelphia. For a complete background of the significance and importance of the serial numbers in the investigation of this homicide, see: *Commonwealth v. Wilson*, 394 Pa. 588, 595, 596, supra.

cashier more than $700 in chips and, upon noticing that she had returned to him seven of the $100 bills which he had used to buy the chips, he became visibly disturbed and hurried out of the club. Sergeant Dunn, of the Las Vegas police force, who had witnessed this chain of events, then followed Ellsworth outside and placed him under arrest "for suspicion or investigation of robbery." Within a few minutes, Wilson appeared, having just exited from the Westerner Club. Wilson tried to walk past Ellsworth but Sergeant Dunn called him back and took him into custody. The time was then approximately 12:15 A.M., July 7, 1955.[5]

At the scene of the arrests, Sergeant Dunn made an initial brief search of both suspects (Search No. 1) to determine if they were carrying any weapons. According to Sergeant Dunn, this initial search consisted only of a "patting" of the clothes of the suspects. It was not until Ellsworth and Wilson arrived at the police station—approximately two minutes after their arrest—that their pockets were searched and the contents removed (Search No. 2): "Q. . . . Now, after you took these two men, after you told these two men they were under arrest for . . . suspicion of robberies did you say? A. Yes, sir. Q. Investigation of robberies. What did you do with them? A. Put them in the police car after I made a search for weapons, just patting them. Q. You were patting them? A. Just to feel them to see if they had any knives, guns. Q. Did they have any weapons? A. No, sir. Q. What did you do with them then? A. Took them down to the Police Department two blocks away in the police car . . . ." . . . . "Q. By the time you got them to the police station what time was it? A. I would say about—it's only about two minutes from the place of arrest. Q. It would be between 12:15 and 12:20? A. Yes. Q. And then you went through the searches? A. Yes."

---

[5] Both arrests were made without a warrant.

The search at the police station (Search No. 2) of Ellsworth's pockets produced $6868—most of which was in new $100 bills of the "C" series—, a key to room 266 of the Dunes Hotel, some gambling chips and miscellaneous papers consisting of cards of attorneys and bail bondsmen. The concomitant search of Wilson's pockets resulted in the discovery of $9686 which included several thousand dollars in new $100 bills of the "C" series.

After Ellsworth and Wilson were questioned and "booked", three Las Vegas policemen, two F.B.I. agents and three deputy sheriffs, *without a warrant,* searched Room 266 of the Dunes Hotel. This search (Search No. 3) took place at approximately 2:30 A.M., July 7, 1955, which led to the discovery—in shoes, suitcases and a sock—of $69,000 in currency of which $66,200 was in new $100 bills mostly of the "C" series. The serial numbers of the currency discovered on the persons of Ellsworth and Wilson in their hotel room were duly recorded and a list kept thereof.

Shortly after his arrest, Ellsworth requested and received permission to call a lawyer. This lawyer, by an order of court, obtained the release of both Ellsworth and Wilson on July 7, 1955, and the court further directed that the money seized from them be returned through their attorney. Approximately a week later, both Ellsworth and Wilson were rearrested. However, the money which had been with them in Las Vegas was never recovered.

On this appeal, the principal contention is that Ellsworth was denied due process of law, guaranteed him under the 14th Amendment of the U. S. Constitution, because the trial court at his second trial had permitted the reception into evidence of the fruits of the three searches mentioned, supra.[6] Of course, reli-

---

[6] The alleged fruits of the "poisonous tree" were the *serial numbers* of the currency found on Ellsworth's person and in the hotel room.

ance was placed on *Mapp v. Ohio,* 367 U.S. 643, 81 S. Ct. 1684.

Consideration of Ellsworth's argument must be made along the line of three inquiries: (1) is the *Mapp* rule—enunciated on June 19, 1961—applicable to the case at bar in view of the ruling in *Linkletter v. Walker,* 381 U.S. 618, 85 S. Ct. 1731 (1965) that the *Mapp* rule was not retroactive in its application? (2) if the *Mapp* rule is applicable, was Ellsworth's arrest without a warrant a lawful arrest? (3) if the arrest was lawful, were the three subsequent searches without a warrant lawful?

The court below held that *Mapp*—which applied the federal rule excluding evidence seized in violation of the Fourth Amendment to the state courts—was not applicable to the case at bar, stating: "The action of the police was in accordance with constitutional principles then obtaining in 1955. The officers could not know that in 1961 [the date of *Mapp*], six years later the Supreme Court of the United States would pronounce that what they did was or might be considered a violation of the Constitution." Shortly after the determination of the court below, the U. S. Supreme Court in *Linkletter v. Walker,* 381 U.S. 618, 85 S. Ct. 1731,[7] held that the *Mapp* ruling does not operate retrospectively upon any state court judgment of sentence which had become *final* prior to June 19, 1961, the date of *Mapp.* In defining finality within the context of its *Linkletter* ruling, the Court said: "By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before our decision in Mapp v. Ohio.": *Linkletter v. Walker,* 85 S. Ct. at 1734, n. 5, 381 U.S. at 622, n. 5. Within the *Linkletter* definition of "finality", Ellsworth's judgment of convic-

---

[7] The *Linkletter* opinion was handed down on June 7, 1965.

tion had not become *final* in 1961 nor even in 1965 when its direct appellate review was pending. Therefore, under the teaching of *Linkletter,* supra, and *Angelet v. Fay,* 381 U.S. 654, 85 S. Ct. 1750, the *Mapp* rule is applicable to the evidence obtained from the searches in the case at bar even though such searches took place in 1955.

Even if *Mapp* is applied, the seized evidence was properly admitted at trial if the three searches were lawful. The legality of the searches without warrants depends, initially, upon the validity of the arrest, itself without a warrant, and, in testing the validity of such arrest, we must apply the federal constitutional standards: *Ker v. California,* 374 U.S. 23, 83 S. Ct. 1623. As Mr. Justice HARLAN (concurring in the result in *Ker*) tersely commented: "Henceforth state searches and seizures are to be judged by the same constitutional standards as apply in the federal system." (*Ker v. California,* supra, 374 U.S. at 45, 83 S. Ct. at 1646). Speaking for the majority in *Ker,* Mr. Justice CLARK set forth the federal standard which must be followed in testing the validity of an arrest without a warrant: "The lawfulness of the arrest without a warrant, in turn, must be based upon probable cause, which exists 'where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.' Brinegar v. United States, 338 U.S. 160, 175-176, 69 S. Ct. 1302, 1311, 93 L. Ed. 1879 (1949), quoting from Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L. Ed. 543 (1925): [citing other authorities]." *Ker v. California,* supra, 374 U.S. at 34, 35, 83 S. Ct. at 1630, 1631.

"The quantum of information which constitutes probable cause—evidence which would 'warrant a man

of reasonable caution in the belief' that a felony has been committed [citing Carroll v. United States, 267 U.S. 132, 162]—must be measured by the facts of the particular case.": *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S. Ct. 407, 413 (1963). See also: *Beck v. Ohio,* 379 U.S. 89, 96, 85 S. Ct. 223, 228 (1964); *Henry v. United States,* 361 U.S. 98, 102, 80 S. Ct. 168, 171 (1959); *Draper v. United States,* 358 U.S. 307, 313, 314, 79 S. Ct. 329, 333 (1959).

Viewing the instant record, what information, if any, did Sergeant Dunn have at the time of the arrests upon which to base a reasonable belief that Ellsworth had committed an offense? He knew that: (a) for a person in attendance at the gambling clubs in Las Vegas Ellsworth was unusually shabbily dressed; (b) Ellsworth was in possession of a sizeable number of new $100 bills which, from Dunn's observation of him, he was obviously anxious to exchange for other money and, possibly, "clean" money; (c) Ellsworth was noticeably and visibly disturbed and upset when the Las Vegas Club cashier returned to him some of the same new $100 bills with which he had purchased chips a short time previously; (d) Ellsworth and Wilson, obviously acquainted with one another, were taking great pains to make it appear that they were not acquainted nor together in the gambling clubs;[8] (e) F.B.I. agent Wheeler had told him that "he [Wheeler] thought he had seen his [Ellsworth's] picture on a wanted notice flyer from the F.B.I.";[9] (f) just prior to July 7, 1955,

---

[8] Dunn had been informed by F.B.I. agent Wheeler of such activities prior to making the arrest.

[9] It was later discovered that F.B.I. agent, Wheeler, had been correct in his recognition of Ellsworth's face from an F.B.I. "wanted flyer", a flyer which had been cancelled shortly before July 7, 1955, by reason of Ellsworth's arrest on a burglary charge in Memphis, Tennessee. On July 7, 1955, Ellsworth was free on bail having posted $35,000 by way of an appeal bond following his conviction in Memphis, Tenn.

there had been a teletype received which reported a bank robbery in the Los Angeles area which involved the taking of "a large amount of hundred dollar bills."[10]

On the basis of such information and observations one can conclude that a reasonably cautious person would have believed, as did Sergeant Dunn immediately before the arrest, that Ellsworth had participated in a robbery. Save for the tenuous connection between Ellsworth's possession of the $100 bills and the teletype concerning the robbery of a bank in the Los Angeles area involving mostly $100 bills, Sergeant Dunn did not have reason to know which robbery or in what state the suspected robbery was. The concatenation of circumstances which unfolded in the gambling casinos considered in conjunction with that which Sergeant Dunn personally observed and that which he had been told by an F.B.I. agent, certainly a trustworthy source, furnished a basis which led Sergeant Dunn to reasonably believe that an offense had been committed and that Ellsworth had taken part in that offense.

Ellsworth's counsel vigorously asserts that, because Sergeant Dunn had no *particular crime* in mind when he arrested Ellsworth for "investigation of robbery", this Court is precluded from a finding that the arrest was made with the constitutionally required "probable cause".[11] The logical consequence of this line of argu-

---

[10] Ellsworth's attorney asked Sergeant Dunn the following questions: "Q. In the teletype recordings of robberies that you had seen did you see anything in particular that related to this defendant, Mr. Ellsworth, or to the bills that he had with him, or anything else about his appearance or conduct or dress that made you connect him with that particular crime? A. In one of the teletypes I remember there was a large amount of hundred-dollar bills taken from a bank. Q. And do you remember what bank it was? A. I believe a bank in the Los Angeles area. Q. And are you fairly certain that you saw such a teletype? A. Yes, sir. Q. Shortly before you placed this defendant under arrest? A. Yes, sir."

[11] The instant record gives no indication that Sergeant Dunn specifically arrested Ellsworth because of the teletype concerning

ment would be the acceptance of the broad proposition that, no matter what evidence an officer may have, if he cannot connect the particular suspect to a *specific crime* which the officer knows to have been committed, then there can be no "probable cause" to arrest without a warrant. Such line of reasoning is untenable.

In *United States v. Zimple,* 318 F. 2d 676 (CA 7), cert. den'd 375 U.S. 868, 84 S. Ct. 128, an arrest, upon suspicion of burglary, which was made without a warrant was upheld even though, *at the time of the arrest,* the officers were unable to connect the suspect with any particular crime. The validity of this arrest was based upon the knowledge of the officers of recent burglaries in the area and their observation of the activities of the person suspected in entering an apartment building, staying therein for a short time, and then moving on to the next apartment building. Before deciding to place him under arrest the officers questioned the suspect for an explanation of his behavior, but it was only *after* the arrest that evidence was discovered linking the suspect to a specific mail theft. The officers' suspicion of burglary was never substantiated. The Court, after stating its belief that the officers had "knowledge supporting a man of reasonable caution in the belief that defendant had committed burglaries", said (p. 679): "That this is the law is fortunate, in view of the practical consideration that officers at the scene of arrest are required to make an immediate decision on the totality of the circumstances there confronting them and a failure to act and the disappearance of the suspect *before the discovery of the crime* would probably render the matter moot. We hold that the arrest of defendant was lawful." (Emphasis supplied).

---

the bank robbery in the Los Angeles area. Of course, even if Sergeant Dunn had that specific robbery in mind, he would have been mistaken.

A fortiori, the same practical situations are existent in the case at bar. Ellsworth, whose face had been recognized from an F.B.I. "wanted flyer", was in possession of an inordinately large amount of money, mostly in new $100 bills, particularly unusual for a person as shabbily dressed as he was. He was obviously attempting to appear as if he was not in association with Wilson who also was in possession of a large sum of new $100 bills. If Sergeant Dunn had not arrested Ellsworth before ascertaining what *specific robbery* he had committed, in all likelihood Ellsworth would have been successful in changing the stolen money for "clean" money and in escaping to another state and, perhaps, even another country. To hold that the failure of Sergeant Dunn to connect Ellsworth with *a specific crime* frustrates the existence of "probable cause" would virtually eliminate the right of a police officer to arrest without a warrant. By way of illustration, to carry to its logical conclusion this argument of Ellsworth's counsel would mean that an officer would not be able to arrest without a warrant a bank robber fleeing through the streets at 3 A.M., wearing a mask over his face and carrying a bag leaking $100 bills onto the street, unless the officer happened to know the specific bank which had just been robbed. We cannot believe that this is the present state of the law; we certainly do not believe that it ever should be the law. In our view, where, as in the case at bar, the circumstances are such as would lead a reasonably cautious person to believe that a certain person has committed a robbery, such person may be legally arrested without a warrant before the discovery of the particular robbery which he has committed.

A study of this record further leads us to the conclusion that the "patting" of Ellsworth's clothes at the scene of the arrest (Search No. 1) and the subsequent emptying of his pockets a few minutes later at the po-

lice station (Search No. 2) were valid searches even though made without a search warrant because they were incident to a lawful arrest.[12]  See: *United States v. Rabinowitz,* 339 U.S. 56, 70 S. Ct. 430. Ellsworth, however, submits that Search No. 2 was illegal because any justification for such a search as incident to a lawful arrest, i.e., to protect the arresting officers from concealed weapons and to prevent the destruction of evidence of the crime on the suspect's person, was absent in the case at bar. We disagree. Search No. 2, which took place within five minutes of the arrest, was a more thorough check than Search No. 1 to ascertain exactly what, if any, weapons Ellsworth might have on his person. The mere fact that Ellsworth had been preliminarily searched before being escorted to the police station did not eliminate the possibility that he might still have a potentiality of danger due to the possession of a concealed knife or other weapons which might very easily have been overlooked upon the officers' initial and hasty search (Search No. 1). "The fact that the search was not made until Baskerville was taken to the County Jail from the point of his arrest in Denver, which was only a comparatively short time, did not, in our opinion, prevent the search from being an incident to a lawful arrest.": *Baskerville v. United States,* 227 F. 2d 454, 456 (C.A. 10).

The determination of the validity of the search of Ellsworth's room No. 266 in the Dunes Hotel (Search No. 3) presents a more difficult problem. This search was made without a warrant approximately two hours subsequent to the time when Ellsworth was taken into custody. "The search of the petitioner's room by the police officers was conducted without a warrant of any

---

[12] Ellsworth understandably does not question the legality of Search No. 1 because it occurred almost simultaneously with the arrest and was merely a preliminary check for weapons on Ellsworth's person.

kind and it therefore 'can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant. [citing authorities]'.": *Stoner v. California,* 376 U.S. 483, 486, 84 S. Ct. 889, 891.

A search of a hotel room can fall within such an exception if it is incident to a lawful arrest (*Agnello v. United States,* 269 U.S. 20, 46 S. Ct. 4), but "a search can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest. [citing Agnello v. United States, 269 U.S. 20, etc.]": *Stoner v. California,* supra, 376 U.S. at 486, 84 S. Ct. at 891.[13]

The search of Ellsworth's room in the Dunes Hotel was neither contemporaneous in time—being two hours after Ellsworth had been taken into custody—nor sufficiently adjacent to the scene of arrest—the arrest was made outside the Las Vegas Club and the jail where Ellsworth was immediately taken was eight miles from the Dunes Hotel.[14] Such search did not satisfy the *Agnello* and *Stoner* standards. As Mr. Justice BLACK recently emphasized: "Once an accused is under arrest and in custody, then a search made at another place,

---

[13] "Although some members of this Court [the U. S. Supreme Court] have expressed the view that the statement in Agnello defining the permissible bounds of a search incident to arrest went too far, . . . the Agnello holding as to what may *not* be searched—a house substantially removed geographically from the place of arrest at a time not substantially contemporaneous with the arrest—has never been questioned in this Court.": *Stoner v. California,* supra, 376 U.S. at 487, n. 5, 84 S. Ct. at 892, n. 5.

[14] "Frank Agnello's house was several blocks distant from Alba's house, where the arrest was made. When it was entered and searched [the same day], the conspiracy was ended and the defendants were under arrest and in custody elsewhere. That search cannot be sustained as an incident of the arrests. [citing cases]." *Agnello v. United States,* supra, 269 U.S. at 31, 46 S. Ct. at 5.

without a warrant, is simply not incident to the arrest.": *Preston v. United States,* 376 U.S. 364, 367, 84 S. Ct. 881, 883.

The Commonwealth urges that the legality of Search No. 3 should be judged by the reasonableness of the search in the light of all the particular "facts and circumstances—the total atmosphere of the case.", relying on *United States v. Rabinowitz,* 339 U.S. 56, 66, 70 S. Ct. 430, 435. The Commonwealth argues that one of the most convincing circumstances was that the security officer of the Dunes Hotel had given permission and consent to the officers to search Ellsworth's room. While we agree that *Rabinowitz,* supra, does set forth the *general* guide lines to test the validity of a search without a warrant, yet we believe that, in situations which involve searches of a house, an apartment or a hotel room, there is a special and more exacting standard of what is reasonable. See: *Agnello v. United States,* supra, at pp. 32, 33, 46 S. Ct. at pp. 6, 7; *Arwine v. Bannan,* 346 F. 2d 458, 469, 470 (C.A. 6). It was the heavy burden of the Commonwealth to establish the reasonableness of the search of this hotel room. This burden the Commonwealth did not sustain by reliance upon the permission and consent given by the hotel security officer for a search of this room. It is well settled that, "in the absence of abandonment,[15] a landlord's or hotel's consent to search leased premises is not effective as against the tenant or guest: Stoner v. State of California, supra, 376 U.S. 483, 487-490, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964); Chapman v. United States, 365 U.S. 610, 616-617, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961); United States v. Jeffers, 342 U.S. 48, 51-52, 72 S. Ct. 93, 96 L. Ed. 59 (1951); Lustig v. United States, 338 U.S. 74, 76, 69 S. Ct. 1372, 93 L. Ed. 1819

---

[15] For a recent example of abandonment justifying a search without a warrant, see *Commonwealth v. Coyle,* 415 Pa. 379, 396, 397, 203 A. 2d 782.

(1949) ;" *Drummond v. United States,* 350 F. 2d 983, 989 (C.A. 8).[16] If the consent of the hotel security officer alone cannot validate the search, it cannot accomplish the same result by being a convincing circumstance to show reasonableness. Moreover, since one of the essential elements of reasonableness, i.e., being contemporaneous in time and place to the arrest, is here lacking (accord, *Preston v. United States,* 376 U.S. 364, 368), we can only conclude that the Commonwealth cannot sustain the validity of Search No. 3 under the *Rabinowitz* test.

There is one other ground upon which the validity of Search No. 3 might be sustainable. In *United States v. Jeffers,* 342 U.S. 48, 51, 72 S. Ct. 93, 95, the Court gave recognition to such ground when it said: "The Fourth Amendment prohibits unreasonable searches and unreasonable seizures, and its protection extends to both 'houses' and 'effects'. . . . Only where incident to a valid arrest, United States v. Rabinowitz [supra], or in *'exceptional circumstances',* Johnson v. United States, 1948, 333 U.S. 10, 68 S. Ct. 367, 92 L. Ed. 436, may an exemption lie, and then the burden is on those seeking the exemption to show the need for it, McDonald v. United States, 1948, 335 U.S. 451, 456, 69 S. Ct. 191, 93 L. Ed. 153." However, the factual situation here negates the existence of any such "exceptional circumstances". No moving vehicle was involved. The officers could have prevented the escape of other possible conspirators or the removal of contraband by guarding the hotel room while a search warrant was being procured. *United States v. Jeffers,* 342 U.S. at 52. Search No. 3 cannot be legally sustained.

---

[16] We see no reason to treat on a different basis the consent of a hotel proprietor and the consent of a hotel's security officer who claimed to have legal authority to grant such consent. In both instances, hotel officials are permitting, under the color of authority, that which they have no legal right to permit.

Lastly, Ellsworth contends that the evidence of expenditure of money by Thomas, an alleged co-conspirator, in Florida after the termination of the conspiracy was inadmissible against Ellsworth. Since this case must be retried, it may not be amiss to consider this contention. At Ellsworth's trial, evidence was introduced relating to the circulation by Thomas of three new $100 bills bearing serial numbers which could be traced to money possessed by Mrs. Rossman before her death. There is no dispute that the circulation of these bills by Thomas occurred after the arrest of Ellsworth. Ellsworth asserts that this problem is exactly like the one presented on the first appeal to this Court (*Commonwealth v. Ellsworth*, 409 Pa. 505, 513) where we held that it was error for the trial court to admit "the declarations of Wilson . . . made after the conclusion of the conspiracy," into evidence against Ellsworth.

However, in the instant case, a different rule applies to the admissibility of the *fruits of the crime* discovered by a co-conspirator's action after the termination of the conspiracy: "While the general rule is that the acts and declarations of co-conspirators after the end of the conspiracy are inadmissible, it may always be shown that such other co-conspirators were in possession of the fruits of the crime. . . . The evidence shows that the four were in a conspiracy to rob the bank in question and acted together in robbing it. Where this fact has been proved, it is always admissible to introduce facts, the purpose of which is to trace the stolen property and show the guilt of a co-conspirator, and such testimony is not open to the objection that *it is hearsay acts and declarations in accused's absence after the termination of the conspiracy.*": *Ford v. State,* 110 Texas Crim. R. 484, 488, 9 S.W. 2d 344, 345 (1928). (Emphasis supplied). See also: Wharton's Criminal Evidence (12th ed.), §429, p. 204.

This same point was implicitly made in *Commonwealth v. Wilson,* supra, where we approved of the admissibility of these same three $100 bills circulated by Thomas against Wilson after the termination of the conspiracy: ". . . testimony as to the actions of the co-conspirators, even after the robbery and homicide had taken place was properly admitted in evidence." *Com. v. Wilson,* (394 Pa. at 607).

We conclude that, although the general rule is that declarations of conspirators after the termination of the conspiracy are inadmissible against co-conspirators (*Commonwealth v. Ellsworth,* 409 Pa. 505), evidence may be admitted, even after the end of the conspiracy, to show that such conspirators were in possession of the fruits of the crime.

In view of the illegality of Search No. 3 and that evidence obtained through this illegal search was erroneously received in evidence, we have no recourse other than to grant a new trial.

Judgment reversed and new trial granted.

———

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I find it unnecessary to consider the lawfulness of appellant's arrest and the searches of his person which followed thereafter. In my view, it is sufficient for the purposes of the present appeal that the subsequent entry by the police into appellant's hotel room without warrant was in violation of his constitutionally protected right against unreasonable police invasions and renders inadmissible any evidence obtained thereby. *Mapp v. Ohio,* 367 U.S. 643, 81 S. Ct. 1684 (1961); see *Ker v. California,* 374 U.S. 23, 83 S. Ct. 1623 (1963); *Wong Sun v. United States,* 371 U.S. 471, 83 S. Ct. 407 (1963); cf. *Stoner v. State of California,* 376 U.S. 483, 84 S. Ct. 889 (1964); *Preston v. United States,* 376 U.S. 364, 84 S. Ct. 881 (1964); *United States ex rel. Clark v. Maroney,* 339 F. 2d 710 (3d Cir. 1965). Since

testimony as to what was observed by the police following their unlawful entry was admitted at trial over appellant's objection, I concur in the reversal of the judgment entered below. *Ker v. California,* supra; *Mapp v. Ohio,* supra; cf. *Wong Sun v. United States,* supra. The constitutional impermissibility of introducing this illegally seized evidence cannot be minimized by the cold brutality of the offense charged, by the fact that the case may involve "not very nice people," by reason of the prior jury verdicts in this case, or because such evidence may be viewed as merely cumulative or corroborative.