Commonwealth, Appellant, *v.* Altizer.

Argued June 12, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*Gordon Gelfond,* Assistant District Attorney, with him *James D. Crawford,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellant.

*Louis M. Natali, Jr.,* Assistant Defender, with him *Melvin Dildine,* Assistant Defender, and *Herman I. Pollock,* Defender, for appellee.

OPINION BY SPAULDING, J., September 12, 1968:

This is an appeal by the Commonwealth from an order of the Court of Quarter Sessions of Philadelphia County granting appellee's motion for new trial based on the determination that evidence introduced by the Commonwealth was the product of an unlawful search and seizure.

On July 13, 1967, Police Officer John Kennedy was approached while on duty by a man who stated that he had been in a nearby bar called Track 7, located at 1226 Filbert Street, and that a man sitting next to him had asked him if he wished to buy some postal money orders for "ten dollars apiece." When asked if he believed the informant, Officer Kennedy said that he did.[1] Although he gave a complete description of the man, the informant refused to give his own name. On the basis of that information, the officer went to the bar where he observed appellee, Noah Altizer, who fitted exactly the description by the unnamed informant. He also observed the top half of a packet protruding from appellee's left rear pocket which he correctly assumed, from its shape, to be money orders. "There was no time to get a warrant or anything and I felt that maybe a felony had been committed. I approached him and took them out of his rear pocket."[2] Altizer was then handcuffed and taken to the Central Detective Division where it was established that the money orders had been issued from the Bryant, Alabama post office and were among approximately two thousand stolen during a February 20, 1967 burglary of that office.

At a pretrial proceeding, the Honorable CHARLES L. GUERIN dismissed appellee's motion to suppress the evidence resulting from the search of appellee. Trial was held before the Honorable ROBERT N. C. NIX, JR., sitting without a jury, and appellee was adjudged guilty of receiving stolen goods. After argument on posttrial motions, a new trial was granted by Judge NIX, who stated: "There was not sufficient probable cause to justify the search and . . . the evidence should have been suppressed." From this determination the Com-

---

[1] See note 14, *infra*.
[2] Record, 18a.

monwealth now appeals, the sole issue being the validity of the search and the subsequent arrest.[3]

In response to appellee's claim that the search was invalid the Commonwealth initially contends that probable cause is unnecessary in the case of a seizure by a police officer of contraband which is in plain view. This is a correct statement of the law but apparently is out of context when offered for application in the instant case.

In *Commonwealth v. One 1958 Plymouth Sedan,* 414 Pa. 540, 543, 201 A. 2d 427 (1964), *rev'd on other grounds sub nom., One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693 (1965), contraband was stated to be things and objects outlawed and subject to forfeiture and destruction upon seizure. The term has been applied to such articles as cannot be owned or possessed legally, or are such as are capable of use only in the commission of a crime. For example, contraband has been held to include, in particular connections, an illicit still,[4] membership lists of an organization seeking to overthrow the government of the United States,[5] moonshine liquor,[6] counterfeit money, gambling devices, blackjacks, etc.,[7] slot machines[8] and a malt mill.[9] This would apparently establish one category of articles, i.e., contraband per

---

[3] Neither party raises, on this appeal, any contention regarding the power of Judge Nix to review the determination of Judge Guerin and this court need not, therefore, concern itself with that question.

[4] *U.S. v. Camarota,* 278 Fed. 388 (S.D. Cal., 1922); *State ex rel. Meyer v. Keeler,* 205 Wis. 175, 236 N.W. 561 (1931).

[5] *Haywood v. U.S.,* 268 Fed. 795 (7th Cir., 1920); *State ex rel. Meyer v. Keeler, supra.*

[6] *U.S. v. Alexander,* 278 Fed. 308 (S.D. Fla., 1922).

[7] *People v. Belsky,* 177 Misc. 125, 29 N.Y.S. 2d 535 (1941).

[8] *Elder v. Camp,* 193 Ga. 320, 18 S.E. 2d 622 (1942); *State v. McNichols,* 63 Idaho 100, 117 P. 2d 468 (1941).

[9] *Peek v. State,* 19 Ala. App. 370, 97 So. 374 (1923).

se, considered such because they cannot be possessed legally. There is, however, another class of articles considered contraband stemming not from the nature of the article itself but from the use to which an otherwise legitimate article is put. " 'It is the use to which the property is put that renders property, otherwise lawful, rightful to have, use and possess, subject to seizure and forfeiture'." *One 1958 Plymouth Sedan, supra,* at 543. In that case, an automobile used in the illegal transportation of liquor was held to be contraband and subject to confiscation.

Neither of these concepts can properly be fitted to the facts of the instant case on the present state of the record,[10] for there is nothing per se illegal in the possession of postal money orders, nor does an offer to sell them reduce them to the status of contraband.[11] Were we to accept the theory that the money orders constituted contraband we would, in effect, circumvent the entire continuum of constitutional safeguards surrounding both searches and arrests where the object of the search was either involved in the commission, or the fruit, of a crime.[12]

---

[10] The record in this case does not indicate that the issue of contraband was considered either at trial or on post-trial motions. If there are no legitimate circumstances in which an individual could have in his possession blank United States postal money orders, we might be required to re-examine our determination that the money orders did not constitute contraband. However, for the reason mentioned in n. 12, *infra,* we need not be here concerned.

[11] 39 U.S.C.A. §5104 permits indorsement of postal money orders, which are available in any amount up to, and including, $100.00. *Id.,* §5102. Indeed, the entire postal money order system was instituted to facilitate commercial transfers of funds. 39 U.S.C.A. §5101.

[12] Even were we to agree, however, with the Commonwealth that the money orders were contraband, case law would prevent their use in a criminal prosecution unless there existed, at the time of seizure, sufficient information leading to that seizure to

As to whether there was in fact probable cause requisite to validate the search by Officer Kennedy, the Commonwealth submits *Draper v. United States*, 358 U.S. 307 (1959), while appellee proposes *Wong Sun v. United States*, 371 U.S. 471 (1963), to be more apposite.

In the *Draper* case, Marsh, an FBI agent with 29 years' experience, was stationed at Denver, Colorado and, over a period of approximately six months, had from time to time received information from Hereford, a "special employee" of the Bureau of Narcotics at Denver, for which Hereford was paid small sums of money. Marsh had always found the information given him by Hereford accurate and reliable. On September 3, 1956, Hereford told Marsh that Draper was selling narcotics on a small scale. Four days later, Hereford informed Marsh that Draper had gone to Chicago the day prior and that he would bring back three ounces of heroin to Denver by train on the morning of either September 8th or 9th. Hereford gave Marsh a detailed description of Draper and the clothes he was wearing, mentioned that he would be carrying a tan zipper bag and that he habitually walked very fast. Observation on the morning of the 8th yielded nothing. On the morning of the 9th, however, Marsh and a Denver police officer observed a person with the exact physical attributes and wearing precisely the same clothing described by Hereford alight from an incoming Chicago train and start walking quickly toward an exit. He was carrying a tan zipper bag in his right hand and

---

pass constitutional muster. *Trupiano v. United States*, 334 U.S. 699 (1948); *Commonwealth v. Patti*, 205 Pa. Superior Ct. 379, 209 A. 2d 17 (1965); accord, *Commonwealth v. Bondi*, 211 Pa. Superior Ct. 23, 234 A. 2d 191 (1967).

The probable cause requirement of the Fourth Amendment is applicable to both searches and arrests. *Commonwealth v. Bondi*, supra; *Wong Sun v. United States*, infra.

the left was in his raincoat pocket. He was overtaken and arrested. A subsequent search revealed two envelopes containing heroin in his left hand and a syringe in the zipper bag which he was carrying in his right hand.

In *Wong Sun,* after arresting one Hom Way and finding heroin in his possession, the FBI learned from him that he had purchased the heroin from one "Blackie Toy." Acting on some rather imprecise information rendered by Way, one James Wah Toy was subsequently arrested. (It was never established whether Toy was in fact the "Blackie Toy" mentioned in Hom Way's information.) Toy revealed, during questioning, that someone known to him only as "Johnny" had been selling narcotics. He gave the FBI an address of the house where "Johnny" lived. "Johnny" was arrested shortly thereafter and, in the course of questioning, stated that he had purchased the heroin from one "Sea Dog," revealed by Toy to be Wong Sun. Wong Sun was then arrested.

The Court in *Draper,* after rejecting the contention that hearsay is not competent to establish probable cause, noted that the information given to Marsh came from one who was employed specifically for that purpose and whose information had always been found accurate and reliable in the past. On that basis, the Court concluded the information was sufficient, when joined with Marsh's own corroboration verifying, to the extent possible, its accuracy, to establish probable cause.

In *Wong Sun,* the Court held no probable cause had been established and the arrests of James Wah Toy and Wong Sun both were improper. As to the statement in *Draper* that "identification of the suspect by a reliable informant may constitute probable cause for arrest where the information is sufficiently accurate to lead the officers directly to the suspect," the

Court noted in contrast that the information which the agents in *Wong Sun* received "merely invited the officers to roam the length of Leavenworth Street (some 30 blocks) in search of one 'Blackie Toy's' laundry—and whether by chance or other means . . . they came upon petitioner Toy's laundry, which bore not his name over the door, but the unrevealing label 'Oye's'. . . . To hold that an officer may act in his own, unchecked discretion upon information too vague and from too untested a source to permit a judicial officer to accept it as probable cause for an arrest warrant, would subvert [the policy of the Fourth Amendment]." 371 U.S. at 480-482. Regarding the arrest of Wong Sun, the Court commented: "We have no occasion to disagree with the finding of the Court of Appeals that his arrest, also, was without probable cause or reasonable grounds." *Id.,* at 491.

As stated in *Costello v. United States,* 324 F. 2d 260 (9th Cir., 1963), there exist "at least two means by which the credibility of an informant may be established. One is by corroborating external circumstances occurring in the course of the very case that is at issue. . . . The other is the fact that on prior occasions in other cases the informant has given information which turned out to be reliable." See also *Willson v. Superior Court,* 46 Cal. 2d 291, 294 P. 2d 36 (1956) (opinion by TRAYNOR, J.). Likewise, in *Walker v. United States,* 327 F. 2d 597 (D.C. Cir., 1963), the court stated that "reliance may be placed upon unidentified informants 'so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.' [citation omitted]."

Our next task must then be to establish the extent of corroborating circumstances necessary to justify the officer's reliance on the proffered information in the instant case. To this end the facts in *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A. 2d 304 (1953), *cert. de-*

*nied,* 375 U.S. 910 (1963), which bear a striking resemblance to those of the instant case, may be considered. On July 10, 1961, a burglary of a wholesale jewelry store occurred in Philadelphia, in the course of which some watches were stolen. While investigating, the police requested persons in the area to report to detective headquarters any person seen "with watches." The next day, the police received an anonymous telephone call which informed them that there was a man—described as having bushy grey hair, needing a shave, short in stature, Italian in appearance, and attired in tweed pants and a striped shirt—in a certain taproom, located in the vicinity of the burglarized store, who was "attempting to sell watches" to the taproom customers. The police immediately went to this taproom and saw no one there who answered the description. However, in a nearby taproom across the street the detectives found a man seated at a table who fully answered the description. He was directed to stand and was patted down by the detectives, the result of which was the removal of ten watches from his trouser pockets, eight of which were later identified as part of the stock taken from the burglarized store. In holding the arrest of Bosurgi valid, the court, by implication at least,[13] held reliable the information received from the undisclosed source, since the knowledge that Bosurgi had offered watches for sale could have come from no other source, and such knowledge must have constituted a significant measure of the probable cause which the court found to exist.

---

[13] The only explicit reference to the reliability of the information imparted to the police over the telephone is contained in a footnote: "The record indicates that the caller had not given information to the police in the past, the informant's reliability was assumed and the call taken 'for what it was worth.'" 411 Pa. at 58, n. 2.

It should be apparent, then, that *Bosurgi* is relevant in establishing the extent of corroborating circumstances necessary to justify reliance on information from an unidentified source, for all of the critical elements in *Bosurgi* are present in the case at bar. In addition, there was here a face-to-face confrontation between the officer and the unidentified source, absent in *Bosurgi*, at which time the police officer had an opportunity to evaluate the source of the information.[14] Similarly, the information imparted to Officer Kennedy was corroborated not only to the extent that he was able to identify appellee from the description given him, but he was also able to observe personally the money orders which apparently had been the object of the offer of sale. This differs markedly from *Bosurgi* in that the police there submitted nothing to indicate that they could observe, before the search, any of the watches which they later removed from Bosurgi's person. In our judgment, sufficient corroborating circumstances existed in this instance to justify reliance by the police officer on the information from the unidentified source.

Our question now must be: Did there exist, at the time of the search, sufficient information within the officer's knowledge to establish probable cause?

It is axiomatic that a search or arrest with or without a warrant must be based upon firmer ground than mere suspicion, see *Henry v. United States,* 361 U.S. 98 (1959), though the arresting officer need not have evidence which would prove sufficient to obtain a conviction. The quantum proof which constitutes probable cause—evidence which would lead a man of reasonable caution to believe that a felony had been committed, *Carroll v. United States,* 267 U.S. 132 (1925)—

---

[14] The informant was, according to Officer Kennedy, "well-dressed," "sober" and "looked like a business man or something." Record, 6a.

must be determined on the facts of each particular case, and the requirements of reliability and particularity of the information on which an officer may act are certainly no less stringent where a warrant is absent, *Wong Sun v. United States, supra,* lest a principle incentive existing for the procurement of warrants be destroyed.

The court below, in an able opinion, apparently predicated its conclusion that probable cause did not exist on the fact that the officer in the instant case "did not have knowledge of the fact that there had been a burglary in which money orders had been stolen and there was no reasonable or probable cause to believe that a felony had been committed."[15] Knowledge that a specific crime has been committed is undoubtedly a weighty element in the balancing process of determining whether probable cause did or did not exist, but the position that its absence conclusively negates the establishment of probable cause, implicit in the opinion of the court below, is untenable. As the Supreme Court stated in *Commonwealth v. Ellsworth,* 421 Pa. 169, 179-180, 218 A. 2d 249 (1966) : "[Appellant's] counsel vigorously asserts that, because Sergeant Dunn had no *particular crime* in mind when he arrested [appellant] for 'investigation of robbery', this Court is precluded from a finding that the arrest was made with the constitutionally required 'probable cause'. The logical consequence of this line of argument would be the acceptance of the broad proposition that, no matter what evidence an officer may have, if he cannot connect the particular suspect to a *specific crime* which the officer knows to have been committed, then there can be no 'probable cause' to arrest without a warrant."[16] Likewise, the conclusion of the court be-

---

[15] Unreported opinion of the Court of Quarter Sessions of Philadelphia, No. 228 August Sessions, entered June 20, 1968.

[16] Although *Ellsworth* concerned itself with an arrest and the instant case deals with a search, probable cause must exist in ei-

low is seemingly in conflict with the substance of the elements repeated so many times when defining probable cause: evidence which would lead a man of reasonable caution to believe that a felony had been committed and that the person to be arrested has committed or is committing the offense. *Commonwealth v. Bosurgi, supra; Henry v. United States, supra; Draper v. United States, supra; Carroll v. United States, supra.* There is nothing to indicate that the specific knowledge mandated by the court below is required. On the contrary, the phrase "evidence which would lead a man of reasonable caution to believe that a felony had been committed" implicitly rejects such a contention. One need only have probable cause to believe such an offense has been committed. When viewed in this light, the conclusion of the officer: "In my estimation to have that many money orders I thought they were stolen," (Record, 26a) does not seem to be unwarranted, especially when considered in the context of the taproom itself and the neighborhood in which it was located.[17] While it is true, as appellee demonstrates, that the information supplied in the case at bar did not describe any activity illegal on its face, as did the information in both *Draper* and *Wong Sun,* that same distinction was not accepted by the court in *Bosurgi,* for the information supplied to the police in that instance was of the same order as that on which Officer Kennedy based his actions.

The order of the court below granting a new trial is reversed and the record is remanded for proceedings consistent with this opinion.

---

ther case, see n. 8, *supra,* and the statement of the Supreme Court in *Ellsworth* is equally applicable to the case at bar. Actually, the phrase "to arrest without a warrant" is unnecessary.

[17] In the fiscal year ending June 30, 1967, there were 1930 post office burglaries which resulted in the theft of 49,746 money orders, generally in blank. 1967 POSTMASTER GEN'L ANN. REP. 61.