**The PEOPLE of the State of Colorado,
Plaintiff-Appellant,**

**v.**

**Fidel QUINTERO, Defendant-Appellee.**

**No. 82SA174.**

Supreme Court of Colorado,
En Banc.

Jan. 31, 1983.

Dale Tooley, Dist. Atty., Second Judicial Dist., O. Otto Moore, Asst. Dist. Atty., Brook Wunnicke, Chief Appellate Deputy Dist. Atty., Denver, for plaintiff-appellant.

David Vela, Colorado State Public Defender, Thomas M. Van Cleave, III, Deputy State Public Defender, Denver, for defendant-appellee.

ERICKSON, Justice.

This is an interlocutory appeal by the prosecution from an order suppressing evidence seized incident to the arrest of defendant, Fidel Quintero, and from the order setting aside his conviction of second degree burglary, section 18–4–203, C.R.S.1973 (1978 Repl.Vol. 8 and 1982 Cum.Supp.), and ordering that the defendant be granted a new trial.

The defendant waived a jury trial and was tried to the court. The court elected to consider the evidence offered at the trial for both the purpose of determining guilt and to resolve the issues relating to the defendant's motion to suppress the evidence that was seized at the time of his arrest. After the court heard the evidence, the court found the defendant guilty of second degree burglary and denied the motion to suppress. Thereafter, when the motion for a new trial was filed, the court granted the motion to suppress and ordered a new trial because of our opinion in *People v. Schreyer,* 640 P.2d 1147 (Colo.1982). We affirm.

I.

On September 29, 1981, at 12:45 p.m., Darlene Bergan was sweeping the porch of her home at 691 South Vine Street in Denver. It was a hot day and the temperature was in the 80 degree range or above that. Darlene Bergan's house is located adjacent to the bus stop at the corner of Exposition and Vine. She saw a man walking on the opposite side of the street and watched him go up on the porch of the house and stand at the front door for approximately twenty seconds, and then saw him stand at the front window so that he could peer into the front of the house for approximately the same amount of time. He then left the porch and proceeded north and appeared to be looking at the windows on the side of the house. He then walked in a northerly direction on Vine Street, stopped at another house, and then could not be seen by Mrs. Bergan. He was wearing a short sleeve shirt and appeared to be watching Mrs. Bergan. She next saw him at 1:45 p.m. while he was standing at a bus stop next to her house. He had taken off his shirt and had used the shirt to cover a television set. He paced nervously and was trying to thumb a ride or hitchhike while waiting for the bus to arrive. Mrs. Bergan thought he looked quite "antsey" and called the police. The police radio dispatcher reported that a possible burglary suspect was at the corner of Exposition and Vine.

Officer Freeman, a twenty-one year police veteran, was the first to respond and arrived approximately five minutes after the call was made. He asked Quintero for identification and Quintero had none. Other officers who arrived at the scene assisted in the investigation. Quintero claimed that he had bought the television set from someone in the neighborhood for $100 and was trying to go home with it. He was in an undershirt and had brown wool gloves in his back pocket which were found in a "pat down" search for weapons. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While he was being questioned,

Mrs. Bergan made herself known to the officers as the woman who had called the police and reported what she had seen. However, she did not tell the police officers what she had seen before the arrest was made. After Mrs. Bergan identified herself, Quintero was arrested and searched. Under the shirt the police found the television set and a video game. The police also found $140 in cash, five rings (including two class rings bearing different initials and class years), and some ladies jewelry in Quintero's pants pockets when he was searched at the police station.

After the arrest was made, the officers checked the neighborhood and were unable to determine that a burglary had occurred. Later that day, however, the owners of a house one block south of Mrs. Bergan's reported that their house had been burglarized and that a television set and a video game had been stolen. The television set and video game that were in the possession of Quintero when he was arrested were identified as the items taken in the burglary. It was approximately five hours after Quintero was arrested that the police learned that the items taken were obtained in the burglary.

## II.

■ Probable cause to arrest exists when the facts and circumstances within an officer's knowledge are sufficient to support a reasonable belief that a crime has been committed by the person arrested. *People v. Vigil,* 198 Colo. 185, 597 P.2d 567 (1979); *People v. Gonzales,* 186 Colo. 48, 525 P.2d 1139 (1974); *People v. Lucero,* 174 Colo. 278, 483 P.2d 968 (1971). Evidence in plain view can be relied upon to establish probable cause. *People v. McGahey,* 179 Colo. 401, 500 P.2d 977 (1972). The totality of the facts considered as a whole can constitute probable cause even though no one fact, viewed alone, constitutes probable cause. *People v. Eichelberger,* 620 P.2d 1067 (Colo.1980).

■ The arresting officer in this case believed that probable cause existed to arrest Quintero. At the time the arrest was made, the police knew that Quintero was a stranger to the neighborhood, and that he claimed that he had purchased a television set from someone in the neighborhood. They also knew that he had attempted to cover the television set and the video game with his shirt. He had no identification, but no evidence existed to establish that a crime had been committed. *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The police did not learn who the owners of the television set and the video game were until more than five hours after they arrested Quintero. Suspicion does not amount to probable cause and an analysis of the facts requires us to reach the same conclusion which we reached in *People v. Schreyer,* 640 P.2d 1147 (Colo.1982). Moreover, the house where Mrs. Bergan observed Quintero was not the house which was burglarized.

## III.

The lack of probable cause to arrest cannot be remedied by resort to the good faith exception or the inevitable discovery rule. The dissenting views of Justice White in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), would craft a good faith exception for the exclusionary rule whenever a police officer reasonably and in good faith believes his conduct comports with existing law. The majority of the United States Supreme Court to date, however, has refused to recognize this good faith exception. *See Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). Given such refusal, it would be inappropriate for this court to alter established Fourth Amendment doctrine by approving such an exception at this time.

■ We recognize that the General Assembly enacted a statute in 1981 which renders evidence admissible when seized as a result of the "good faith mistake." Section 16–3–308, C.R.S.1973 (1982 Cum.Supp.). The statutory definition of "the good faith mistake" is narrower than a good faith exception espoused by Justice White. A "good faith mistake" under the statute consists of "a reasonable judgmental error con-

cerning the existence of facts which if true would be sufficient to constitute probable cause." Section 16–3–308(2)(a), C.R.S.1973 (1982 Cum.Supp.). The mistake in this case does not center upon a misperception of an existing fact but upon a mistaken judgment of law—that is, the mistaken judgment by the officer that the facts known to him were sufficient to warrant a full custodial arrest of the defendant. Thus, section 16–3–308 has no application in this case.

■ There is no basis in the record for application of the inevitable discovery rule to support the defendant's arrest. The prosecution did not rely upon that rule in imposing the initial suppression motion, nor did it raise the rule in its brief as a basis for reversing the trial court's suppression order. This failure is no doubt attributable to the total lack of concrete evidence in the record to support the application of the rule to the facts of the case. Indeed, the only reasonable inference from the evidence is that the arresting officer recorded the serial number on the television set after the defendant had been arrested and taken to the station house. In contrast to the fact situation in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), where an ongoing search for a homicide victim's body had already been in progress and was continuing simultaneously with and independently of the defendant's illegal interrogation, there is no evidence of independent investigatory measures here. The record lacks even a hint of an independent route by which the serial number of the television could have been constitutionally obtained. To remand the case for a hearing under these circumstances would transform the inevitable discovery rule into a vehicle for upholding police conduct based upon an officer's hindsight appraisal of what constitutionally proper course of conduct he "could" have followed. The focus of the inevitable discovery rule should not be upon what the arresting officer "might" or "could" have done had he not erroneously concluded that probable cause to arrest existed. Rather, the central focus should be on what investigatory measures necessarily or inevitably would have been taken regardless of the officer's decision to arrest.

Accordingly, we affirm the ruling of the trial court suppressing the evidence and ordering that a new trial be granted.

ROVIRA, J., dissents.

ROVIRA, Justice, dissenting:

I respectfully dissent.

The fourth amendment to the United States Constitution assures to the people the right to be secure in their persons, houses, papers and effects, and free from unreasonable searches and seizures. Among other things, this amendment requires that arrests be based upon probable cause—that is, the circumstances must be such as to support a reasonable belief that a crime has been committed by the person arrested. We must not lose sight of the fact that a probable cause determination involves a common-sense question: what would reasonable people believe under the circumstances?

In *People v. Weinert,* 174 Colo. 71, 74, 482 P.2d 103, 104–05 (1971), we said:

" '[P]robable cause exists where the facts and circumstances within the arresting officers' knowledge are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed. In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Lucero v. People,* 165 Colo. 315, 438 P.2d 693, *cert. den.* 393 U.S. 893 [89 S.Ct. 217, 21 L.Ed.2d 173] . . . ."

It is an unfortunate fact, but a fact nonetheless, that a high incidence of residential burglaries is one of the realities of modern urban life. The circumstances surrounding the incident here in question were highly suggestive of a recent burglary. In my view, the officers would have been derelict in their duty had they merely released Quintero. As Justice White observed in his

dissenting opinion in *Stone v. Powell*, 428 U.S. 465, 539, 96 S.Ct. 3037, 3073, 49 L.Ed.2d 1067 (1976):

"Making the arrest in such circumstances is precisely what the community expects the police officer to do. Neither officers nor judges issuing arrest warrants need delay apprehension of the suspect until unquestioned proof against him has accumulated. The officer may be shirking his duty if he does so."

There is no suggestion here that the officers were not acting in good faith. In fact, one officer testified that after stopping Quintero and questioning him Quintero was not arrested immediately because the police did not feel that they had probable cause. It was only after Mrs. Bergan identified herself as the caller that the defendant was placed under arrest. The information provided by the citizen who lived in the area and who observed the defendant prowling around a neighbor's home, in conjunction with the suspect explanation given by the defendant, caused the police to have sufficient facts to believe that a crime had been committed. *See People v. Mathis*, 189 Colo. 534, 542 P.2d 1296 (1975); *People v. Glaubman*, 175 Colo. 41, 485 .P.2d 711 (1971). I cannot conclude that the actions of the police were anything but reasonable under circumstances that warranted the conclusion that an offense had been committed. The fourth amendment requires no more.

Conceding for the sake of argument that the police officers did not have probable cause to arrest when they did, I would remand to the trial court with directions to consider the applicability of the "inevitable discovery rule" to the facts of this case.

In *Brewer v. Williams*, 430 U.S. 387, 406–07 n. 12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 424 (1977), the United States Supreme Court, after concluding that statements made by the defendant about the location of a body were unconstitutionally obtained, stated as follows:

"While neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be ad-

mitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams."

When the case was returned to the state courts, it was determined that given the procedures being used to search for the body the police would have found it in three to five hours without Williams' statement. *State v. Williams*, 285 N.W.2d 248 (Iowa 1979), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980).

In adopting the inevitable discovery rule, the Iowa court adopted a two-part test for its application. *See* W. LaFave, *Search and Seizure* § 11.4 at 620–28 (1978). First, the doctrine may be used only when the police have not acted in bad faith to accelerate the discovery of the evidence. Second, the state must prove that the evidence would have been found without the illegal activity and must prove how it would have been found. The state has the burden of showing these two elements by a preponderance of the evidence.

The New York Court of Appeals has also adopted the rule, emphasizing that literal inevitability of discovery is not required. Rather, what is required is a "very high degree of probability that the evidence in question would have been obtained independently of the tainted source." *People v. Payton*, 45 N.Y.2d 300, 380 N.E.2d 224, 230–31, 408 N.Y.S.2d 395, 402 (1978), *rev'd on other grounds*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). A number of other courts have also adopted the rule. *See, e.g.*, *State v. Phelps*, 297 N.W.2d 769 (N.D.1980); *State v. Beede*, 119 N.H. 620, 406 A.2d 125 (1979), *cert. denied*, 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980); *United States v. Bienvenue*, 632 F.2d 910 (1st Cir.1980).

Here the trial court suppressed not only the television set, but also any testimony by the police officers concerning the serial number of the set found with Quintero. I believe that on remand the People should be permitted to introduce evidence whether

the serial number would have been discovered without the illegal arrest and, if so, how it would have been found.

The application of the exclusionary rule to the facts of this case demonstrates why the rule has come under increasing attack [1] and why courts and legislatures have recognized alternatives such as the "good faith" exception.

In 1981 the Colorado legislature adopted a statute providing that evidence otherwise admissible in criminal proceedings shall not be suppressed if the evidence was seized by the police as a result of a good-faith mistake or of a technical violation. *See* section 16–3–308, C.R.S.1973 (1982 Supp. to 1978 Repl.Vol. 8).

The good-faith rule adopted by the Colorado legislature closely follows the views of Justice White in his dissent in *Stone v. Powell, supra,* where he stated that the exclusionary rule should be "modified so as to prevent its application in those many circumstances where the evidence at issue was seized by an officer acting in the good faith belief that his conduct comported with existing law and having reasonable grounds for his belief." *See United States v. Williams,* 622 F.2d 830 (5th Cir.1980), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981) (upheld seizure of evidence by officers in good faith and in the reasonable though mistaken belief that they are authorized to do so).

The United States Supreme Court has to date not recognized the good faith exception. *See Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). However, in *Illinois v. Gates,* the court requested the parties to address the question whether the exclusionary rule should to any extent be modified, "so as, for example, not to require the exclusion of evidence obtained in the reasonable belief that the search and seizure at issue was consistent with the Fourth Amendment." —— U.S. ——, 103 S.Ct. 436, 74 L.Ed.2d —— (1982).

Application of the "good faith" exception has not been foreclosed by a definitive ruling of the United States Supreme Court. Accordingly, I would apply the "good faith" exception to the case at hand and thus reverse the trial court's order suppressing the evidence which established the defendant's guilt beyond a reasonable doubt.

---

1. *See* Wilkey, *Enforcing the Fourth Amendment by Alternatives to the Exclusionary Rule,*

National Legal Center for the Public Interest, July 1982.