The PEOPLE of the State of
Colorado, Petitioner,

v.

Vincent T. McCOY, Respondent.

No. 92SC190.

Supreme Court of Colorado,
En Banc.

March 14, 1994.

---

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy

M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Timothy R. Twining, Deputy Dist. Atty., Michael J. Ogborn, Sp. Asst. Atty. Gen., Denver, for petitioner.

Betty Ann Bass, Denver, for respondent.

Justice LOHR delivered the Opinion of the Court.

In *People v. McCoy*, 832 P.2d 1043 (Colo. App.1992), the Colorado Court of Appeals reversed the conviction of defendant Vincent T. McCoy for two counts of aggravated robbery[1] and one count of crime of violence.[2] The court of appeals based its reversal on the conclusion that the trial court had erred in ruling that there was probable cause to support the arrest of the defendant without a warrant and in consequently denying the defendant's motion to suppress evidence seized as a result of that arrest. We granted certiorari to determine whether probable cause to arrest requires specific information that a particular crime has been committed by the suspect. Although we hold that such specific information is not an essential ingredient of probable cause to support a warrantless arrest, our evaluation of the totality of the circumstances in the present case causes us to conclude that the arresting officers lacked probable cause to arrest the defendant. We therefore affirm the judgment of the court of appeals.

### I.

The facts in this case are basically undisputed. On February 2, 1987, a Denver jew-elry store was robbed at gunpoint. The robber took between 100 and 130 pieces of jewelry worth approximately $130,000.

On February 18, 1987, Sergeant Addison Thompson of the New Orleans, Louisiana, police department received a telephone call from a previously reliable informant who had more than forty years experience in the gold business.[3] The informant said that a short, stout, black male about twenty-five years old had approached him that day in the central business district of New Orleans and offered to sell him five pieces of jewelry at much less than its obvious value. The informant described the jewelry and estimated its value at between $25,000 and $30,000. The sergeant related the information to Detective Steven Gaudet of the New Orleans police department. At the time Gaudet received this information, the New Orleans police had no knowledge of the Denver robbery.

During the afternoon of the following day, Sergeant Charles Miller of the New Orleans police department received a telephone call from a person who identified himself by name[4] and as an employee of a particular jewelry store located in the central business district of New Orleans. The caller said that two persons had been in the store with a large amount of what appeared to be very expensive jewelry, trying to sell it at a very low price.[5] The caller said that the store is a retail outlet and not a pawnshop, that it is rare for anyone to try to sell jewelry to the store in such a manner, that most of the persons who enter the store are regular customers, and that he had never seen these two individuals before. The caller said that these

1. § 18–4–302, 8B C.R.S. (1986).

2. § 16–11–309, 8A C.R.S. (1986).

3. Evidence was presented that as a result of information from this informant a murder case in Texas had been "cleared" but was still pending, at least two convictions had been obtained on New Orleans rape cases, and the suspect in the murder case had been convicted of possession of stolen property. The officer who had been contacted by the informant said that he had never received unreliable or bad information from the informant. The trial court in ruling on the defendant's motion to suppress found the informant to have been "previously reliable."

4. At the suppression hearing, Sergeant Miller was unable to remember the name of the employee.

5. The police had no specific information on the quantity or description of the jewelry offered on this occasion, nor were they told the price at which jewelry was offered for sale on this occasion or the earlier one.

circumstances aroused his suspicions. He then described the pair as a male and a female, both black, and said that the male was rather stocky and about twenty-five years old. The caller related that the male was wearing a black jacket with the name "McCoy" on it and a red devil on the back and that he was wearing a large amount of jewelry and carrying a little bag. The caller estimated the female was in her twenties and said she was wearing a red jacket. The caller also reported that the two individuals initially were standing outside the store while the telephone conversation was taking place and that as he spoke they walked down the block towards a nearby Burger King and passed out of sight. Sergeant Miller radioed for assistance and broadcast over police radio the information he had received from the jewelry store employee.

Detective Gaudet overheard the broadcast and was also aware of the information the police had received from the informant's call of the previous day. Based upon the description given by the informant and the employee, Gaudet, accompanied by other officers, located and readily identified McCoy and his companion at the Burger King and promptly advised them that they were under arrest for investigation of possession of stolen property. The prosecution stipulated that the pair were arrested at the moment the police contacted them. In searching McCoy incident to the arrest, the police discovered a large amount of expensive jewelry.

In a written statement, McCoy's companion stated that McCoy told her that he had robbed a jewelry store in Denver. Acting pursuant to a search warrant, the police later discovered additional jewelry and a handgun in the motel room where McCoy and his companion were staying.

 McCoy was returned to Denver and was convicted of two counts of aggravated robbery and one count of crime of violence following a jury trial in Denver District Court. Prior to trial, McCoy filed a motion to suppress the evidence found on him and at the motel on the ground that the police lacked probable cause to arrest him without a warrant. The trial court found both the informant and the jewelry store employee reliable,[6] held there was probable cause to arrest, and denied the motion. On appeal, the court of appeals concluded that McCoy's arrest was not supported by probable cause and that the evidence derived from the arrest was therefore improperly received at trial. The court determined that the error was not harmless and accordingly reversed the trial court's judgment and remanded the case for a new trial.[7] *McCoy*, 832 P.2d at 1046–47.

## II.

We first consider the issue on which we granted certiorari: whether an arresting officer must possess specific information that a particular crime has been committed by the

---

6. The trial court found that the person who reported the February 18 incident to Sergeant Thompson was reliable based in part on his history of supplying reliable information to police officers on prior occasions. *See* note 3, *supra*. Reliability of a confidential informant can be supported by showing that the informant in the past has supplied information that proved reliable. *People v. Arellano*, 791 P.2d 1135, 1139 (Colo.1990); *People v. Varrieur*, 771 P.2d 895, 898 (Colo.1989); *see Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959); *People v. Martinez*, 173 Colo. 17, 21, 475 P.2d 340, 342 (1970). The court considered the jewelry store employee to be a citizen informant and found him reliable on that basis. When the source of information is an identified citizen informant with first hand knowledge of the incident reported, such information is sufficiently

reliable to be utilized in determining the existence of probable cause. *People v. Donnelly*, 691 P.2d 747, 749 (Colo.1984). In such circumstances the prosecution is not required to establish either the credibility of the citizen or the reliability of the information. *People v. Pate*, 705 P.2d 519, 521 (Colo.1985); *People v. Henry*, 631 P.2d 1122, 1127 (Colo.1981).

7. The court of appeals held that on retrial before admitting any evidence discovered at the hotel room, the court must address whether such evidence was obtained as the fruit of the unconstitutional arrest of McCoy and is therefore inadmissible. *McCoy*, 832 P.2d at 1046–47. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963); *People v. Madson*, 638 P.2d 18, 33 (Colo.1981).

suspect in order to effectuate a valid warrantless arrest. The general principles concerning the validity of warrantless arrests are well settled and guide our analysis.

### A.

■ Both the United States Constitution and the Colorado Constitution guarantee the right of the people to be secure in their persons against unreasonable seizures. U.S. Const. amends. IV, XIV; Colo. Const. art. II, sec 7. To effectuate these guarantees, police must have probable cause to arrest before they can subject a person to those deprivations of liberty that result from being arrested. *Gerstein v. Pugh*, 420 U.S. 103, 111–12, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975) ("The standard for arrest is probable cause...."); *People v. Wolf*, 635 P.2d 213, 217 (1981) ("Probable cause measures the constitutionality of an arrest by law enforcement officers."). The probable cause standard "represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime." *Gerstein*, 420 U.S. at 112, 95 S.Ct. at 862; *accord People v. Rayford*, 725 P.2d 1142, 1146 (Colo.1986).

■ "'Probable cause to arrest exists when the objective facts and circumstances available to a reasonably cautious officer warrant the belief that an offense has been or is being committed by the person arrested.'" *People v. Alexander*, 797 P.2d 1250, 1253–54 (Colo.1990) (quoting *People v. Freeman*, 668 P.2d 1371, 1377 (Colo.1983)); *accord Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964); *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). That is, probable cause to arrest requires that at the time an arrest is made the police have probable cause to believe a crime has been or is being committed and probable cause to believe the person to be arrested· has committed or is committing the crime. "In determining whether there is probable cause to arrest, the totality of facts and circumstances known to the officer at the time of the arrest must be considered." *Peo-*

*ple v. Diaz*, 793 P.2d 1181, 1183 (Colo.1990); *accord People v. Florez*, 680 P.2d 219, 225 (Colo.1984). Due consideration must be given to a law enforcement officer's training and experience in determining the significance of the officer's observations for this purpose. *People v. Ratcliff*, 778 P.2d 1371, 1375 (Colo. 1989); *see People v. Melgosa*, 753 P.2d 221, 225 (Colo.1988). The probable cause standard is a practical, nontechnical conception and is to be measured by reasonableness, not mathematical probability. *People v. Rayford*, 725 P.2d at 1146. Mere suspicion, falling short of probable cause, is not sufficient to justify a warrantless arrest under constitutional standards. *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 412–13, 9 L.Ed.2d 441 (1963); *People v. Saars*, 196 Colo. 294, 298, 584 P.2d 622, 625 (1978). "The burden of proof is on the prosecution to establish the existence of probable cause to support a warrantless arrest." *Diaz*, 793 P.2d at 1183.

### B.

■ It is true that when assessing the totality of facts and circumstances to determine whether probable cause to arrest exists, an officer must consider any specific available information that a particular crime has been committed. However, lack of such information does not preclude a warrantless arrest if other facts known to the arresting officer warrant a belief that an offense has been or is being committed by the person to be arrested. *United States v. Thevis*, 469 F.Supp. 490, 504 (D.Conn.), *aff'd*, 614 F.2d 1293 (2d Cir.1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980) ("The fact that the officers could not say with certainty which particular crime had been committed or in fact that any crime had been committed does not mandate a finding of no probable cause."); *Campbell v. United States*, 273 A.2d 252, 254 (D.C.1971) (knowledge of the commission of a particular crime is not an essential element of probable cause to arrest); *State v. Simms*, 571 So.2d 145, 149 (La.1990) ("It is not a prerequisite for the existence of probable cause that the po-

lice know at the time of the arrest that a particular crime has definitely been committed."); *Commonwealth v. Ellsworth*, 421 Pa. 169, 218 A.2d 249, 255 (1966) (probable cause may exist in the absence of knowledge of a particular crime); *Stinson v. State*, 578 S.W.2d 667, 668 (Tenn.Crim.App.1978) (the lack of knowledge of either the crime committed or the identity of the victim does not render the arrest illegal); *see United States v. Portillo*, 633 F.2d 1313, 1324 (9th Cir.1980) (warrantless arrest was supported by probable cause "even though no felony had been committed by [the suspect], or in fact, by anyone."); *United States v. Zimple*, 318 F.2d 676, 679 (7th Cir.1963) (warrantless arrest upheld based on observation of conduct that supported reasonable belief that suspect had committed burglaries); *see also* 2 Wayne R. LaFave, *Search and Seizure*, § 3.6(a) (2d ed. 1987) ("[I]t is not essential to a finding of probable cause that the officer be able to relate the person [to be arrested] or property [in the person's possession] to some particular prior crime."). To hold otherwise would preclude police from making warrantless arrests when confronted by circumstances that overwhelmingly indicate that a crime has occurred. Such a result would not "give fair leeway for enforcing the law in the community's protection." *Brinegar*, 338 U.S. at 176, 69 S.Ct. at 1311.

In the present case, the court of appeals, citing *People v. Quintero*, 657 P.2d 948 (Colo.), *cert. granted*, 463 U.S. 1206, 103 S.Ct. 3535, 77 L.Ed.2d 1386, *and cert. dismissed*, 464 U.S. 1014, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983), stated that "if the police have no information that a crime has, in fact, been committed, probable cause for an arrest does not exist." *McCoy*, 832 P.2d at 1045. This statement reflects a misreading of *Quintero*.[8]

In *Quintero*, we affirmed the ruling of the trial court suppressing evidence obtained as a result of a warrantless arrest. *Quintero*. 657 P.2d at 951. Quintero was arrested while standing at a street corner bus stop. At his side were a television set and a video game, which he had covered with his shirt. The arresting officer heard a police radio dispatch, initiated by a call from a citizen, indicating only that a possible burglary suspect was at that corner. The officer approached Quintero, asked him for identification, and learned that he had none. Quintero said that he had bought the television from someone in the neighborhood for $100 and was trying to go home with it. The officer, who had been joined by other police officers and by the citizen who made the initial report, then arrested Quintero. It was approximately five hours later before the police learned that the television set and video game were taken in a burglary. In upholding the suppression order we noted that the police knew that Quintero was a stranger to the neighborhood, that he claimed to have purchased a television set from someone in the neighborhood, that he had attempted to cover the television set and video game with his shirt, and that he had no identification. We also observed that "no evidence existed to establish that a crime had been committed." We then stated that "[s]uspicion does not amount to probable cause" and concluded that probable cause was lacking to support the arrest. *Id.* at 950.

*Quintero* did not establish a principle that specific information that a particular crime has been committed is essential to probable cause. Properly understood, *Quintero* is simply an application of the totality of the circumstances test to particular facts.

Neither did our decision in *People v. Schreyer*, 640 P.2d 1147 (Colo.1982), cited by the court of appeals, require that police have specific information that a particular crime has been committed in order to establish

---

8. It is not entirely clear from the court of appeals' opinion whether this was the standard applied. There is language later in the opinion that suggests that the arresting officers need have possessed only "information that allowed them to form a reasonable belief that a crime had actually been committed," *McCoy*, 832 P.2d at 1046, a formulation consistent with the totality of the circumstances test. Consistent also with this latter test is the court of appeals' statement that probable cause was lacking because of the absence of information other than the attempt to sell jewelry at a price substantially below its fair market value "from which it may reasonably be inferred that the jewelry is illegally in the seller's possession." *Id.*

probable cause for a warrantless arrest. *Schreyer* involved the arrest of a suspect who had been the subject of a report by citizens that a person had been seen walking around cars in a residential neighborhood at an early morning hour, placing some items in the trunk of a car, and driving away. In ruling that probable cause for a warrantless arrest was lacking, we noted that the police were unaware that any crime had been committed. *Schreyer,* 640 P.2d at 1150. We did not thereby imply that police must necessarily possess such information to meet the probable cause requirement. *Schreyer* is simply another case in which absence of information that a particular crime had been committed was one factor in evaluating the totality of the circumstances leading to our conclusion that "the objective facts known to the officer at the time the defendant was arrested did not amount to probable cause." *Id.* at 1150–51.

Accordingly, we hold that probable cause for a warrantless arrest does not require specific information that a particular crime has been committed.[9]

### III.

We next consider whether the New Orleans police had probable cause to arrest McCoy.[10] This requires that we determine whether there was probable cause to believe that a crime had been or was being committed and probable cause to believe that McCoy had committed or was committing it.

The police had probable cause to believe that the person who offered the jewelry at the jewelry store was the same person they located at Burger King and identified as McCoy. The specificity of the description given by the jewelry store employee, the information concerning the direction McCoy and his companion were walking, and the prompt arrival of the police at Burger King after receiving that information[11] provided ample probable cause to believe that the man they located there, who matched the jewelry store employee's description,[12] was the same person who had tried to sell jewelry at the store. Whether there was probable cause to believe that the person who tried to sell five items of jewelry to an informant a day earlier was the same person arrested at Burger King is much more problematic because of the generality of the description of the person who offered the jewelry on the former occasion and the absence of information indicating that any of the same jewelry was

9. Some courts have stated that when the police do not have specific information that a particular crime has been committed, more and better evidence is needed to prove that probable cause exists to support an arrest without a warrant. *State v. Johnson,* 363 So.2d 684, 689 (La.1978); *State v. Frazier,* 421 A.2d 546, 550 (R.I.1980); *see also* 1 Wayne R. LaFave, *Search and Seizure,* § 3.2(e) at 596–97 (2d ed. 1987). As the Supreme Court of Illinois put it, "[w]here there is uncertainty as to whether a crime has been committed, the privacy rights may be given more consideration [in striking the balance between interests of privacy and law enforcement]." *People v. Wright,* 111 Ill.2d 128, 95 Ill.Dec. 787, 793, 490 N.E.2d 640, 646 (1986). We are confident that our totality of the circumstances test adequately includes these concepts, which are simply ways of noting the importance of knowledge that a crime has been committed as a factor in determining probable cause.

10. Because the prosecution stipulated, and the trial court determined, that McCoy was arrested immediately upon contact by the police, none of the officers' actions can be justified as based on a permissible investigatory stop supported by reasonable suspicion. *See, e.g., Terry v. Ohio,* 392

U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *People v. Lingo,* 806 P.2d 949, 952 (Colo.1991); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971). The prosecution does not contend that the seizure can be supported on that basis.

11. "An officer who does not personally possess sufficient information to constitute probable cause may nevertheless make a valid arrest if he acts upon the direction or as a result of a communication from a fellow officer, and the police, as a whole, possess sufficient information to constitute probable cause." *People v. Freeman,* 668 P.2d 1371, 1377 (Colo.1983); *accord, e.g., People v. Alexander,* 797 P.2d at 1254. This is commonly referred to as the fellow officer rule.

12. Although the trial court found that the arresting officer "recognized that the defendant was wearing jewelry, including a large rope chain and other items of jewelry," it is clear from the record that the officer did not see this jewelry until he had arrested McCoy. In light of all the other identifying characteristics reported to the officers, we do not regard this discrepancy as significant.

offered on both occasions. Assuming for the purpose of argument that there was probable cause to believe that McCoy was the person who had engaged in the suspicious activity on both occasions, the critical issue becomes whether the information concerning his activities constituted probable cause to believe that he had committed or was committing a crime.[13]

Neither the defendant's physical characteristics nor his attire contributes to a conclusion that a crime had been or was being committed. It is his offer of jewelry for sale at greatly reduced prices under the circumstances outlined above that provides the only basis to suspect the commission of a crime. Certainly there are innocent reasons why a person might find it necessary to sell items of personal jewelry at greatly reduced prices. In the second incident, the defendant walked into an established jewelry store where he was not known and offered to sell jewelry. The incident took place in the afternoon. The defendant wore a jacket on which his name was displayed and also wore a large amount of jewelry. The very openness of the offer tends to undermine the suspicion that the jewelry was stolen. *Cf. United States v. Welker*, 689 F.2d 167 (10th Cir.1982) (where Spanish–American arrestee removed an envelope from an apartment mailbox in broad daylight and without acting furtively in a neighborhood the arresting officer considered to be black, and could produce no identification on request, the officer lacked probable cause to arrest). The arresting officer himself, as a basis for the arrest, informed McCoy that he was *under arrest for investigation* of possession of stolen property, suggesting a lack of probable cause for the arrest.

The determination of when facts cross the line from reasonable suspicion to probable cause is difficult. "That line necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances." *Brinegar*, 338 U.S. at 176, 69 S.Ct. at 1311;

*see generally* 2 Wayne R. LaFave, *Search and Seizure*, § 3.6(a) (2d ed. 1987). Giving due regard to the competing personal liberty and crime control interests at stake, and considering the totality of the circumstances, one of which is the absence of knowledge of a crime, we hold that the facts here give rise to reasonable suspicion but fall short of establishing probable cause to believe a crime had been or was being committed by McCoy when he was arrested.

We therefore affirm the judgment of the court of appeals.

SCOTT, J., specially concurs.

ROVIRA, C.J., dissents, and VOLLACK and MULLARKEY, JJ., join in the dissent.

Justice SCOTT specially concurring:

I agree with the majority that, based upon the totality of circumstances in this case, the arresting officers lacked probable cause to arrest Vincent McCoy. I write separately, however, because I do not consider this to be one of those many close cases requiring either an intricate subjective balancing of the facts, or a difficult judgment call as to whether the circumstances evinced probable cause to support a warrantless arrest.

I

The concept of probable cause is ensconced in the Fourth Amendment which requires that "no warrants for either searches or arrests shall issue except 'upon probable cause.'" *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Historically, the general warrant, dating back to the mid–1700's, allowed police to arrest and search on mere suspicion that some illegal act had been committed. *Id.* at 100, 80 S.Ct. at 170. In 1776 however, the Virginia and Maryland Declarations of Rights served to abolish the practice, with both bills characterizing the general warrant as "grievous and

---

**13.** Possession of stolen property is a crime in Louisiana, La.Rev.Stat.Ann. § 14:69 (West 1986), as it is in Colorado, §§ 18–4–401 and 18–4–410, 8B C.R.S. (1986 & 1993 Supp.).

oppressive." *Id.* at 100–01, 80 S.Ct. at 169–70. Around the time that the general warrant was beginning to be disfavored by the houses of commons, the decisional law was similarly holding that "common rumor or report, suspicion, or even 'strong reason to suspect' was not adequate" to make an arrest. *Id.* at 101, 80 S.Ct. at 170–71.

More than two hundred years later, there has been no retrenchment of this principle; it is well-settled that while "[e]vidence required to establish guilt is not necessary," a finding of probable cause exists when a "prudent [person] in the shoes of the [arresting] officers would have seen enough to permit them to believe that [the defendant] was violating or had violated the law." *Id.* at 102, 80 S.Ct. at 171. Rejecting arrests premised on bare suspicions, we have held that probable cause may be found where a person of reasonable caution has sufficient information to believe that a person is violating or has violated the law. *People v. Quintero,* 657 P.2d 948 (Colo.), *cert. granted,* 463 U.S. 1206, 103 S.Ct. 3535, 77 L.Ed.2d 1386 *and cert. dismissed,* 464 U.S. 1014, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983). In determining whether that constitutional standard has been met, a reviewing court should examine the "facts and circumstances known to the arresting officer" at the time of the arrest, and should not be persuaded "by subsequently acquired information." *People v. Thompson,* 793 P.2d 1173, 1175 (1990). Finally, under the totality of circumstances test, in order to establish probable cause to arrest based on suspicions of informants, the police should either corroborate or verify non-incriminatory facts provided by first-time informants. *People v. Turcotte–Schaeffer,* 843 P.2d 658 (Colo.1993); *People v. Diaz,* 793 P.2d 1181 (Colo.1990); *People v. Contreras,* 780 P.2d 552 (Colo. 1989).

Because the facts and circumstances known to the arresting officers here evinced no more than mere suspicion of criminal activity, permitting only an investigatory stop, there was no probable cause to support a warrantless arrest. The absence of probable cause is particularly clear when the facts and circumstances are examined in a context that takes into account the demographic make-up of the location where the arrest occurred.

## A

The challenged arrest in this case occurred in New Orleans, Louisiana, a city in which African Americans, not including other persons of color, comprise well over sixty-two percent of the population.[1] Approximately eight percent of the African American population is composed of males between the ages of twenty to twenty-nine.[2] Of course, it is impossible to know how many of the approximately 25,000 individuals, or more than one in twenty of the approximately one-half million New Orleanseans, fit the description given to the police by the "previously reliable informant": "a short, stout black male about twenty-five years old," maj. op. at 3. Thus, the lack of more discrete information as to distinguishing characteristics about the individual who had offered to sell the informant "five pieces of jewelry" on February 18, 1987, seriously reduces the utility of the information supplied by the first informant. Based on the vague description provided by the first jeweler, any arrest resulting from that description would be unreasonable.

The next day, February 19, the department received a call from an employee at a jewelry store who reported that two persons had been in the store and aroused his suspicions because he had never seen the two before and they attempted to sell a large quantity of expensive jewelry at a very low price. Without providing any information relating to criminal conduct, this second informant, who identified himself by name but was unknown to the police, gave a detailed description of the two suspects, "male and a female, both black," maj. op. at 1234. Al-

---

1. "Census of Population: General Population Characteristics" (U.S. Dept. of Commerce, La. 1990).

2. *Id.*

though the second informant supplied sufficiently detailed information as to the identifying characteristics of the man and the woman,[3] the information provided consisted solely of non-incriminatory factual details. In such cases, either personal knowledge by the arresting officer, or corroboration of details of an informant's tip by independent police work is necessary to support a reasonable belief that a crime has been or is being committed. *People v. Diaz*, 793 P.2d at 1183. As stipulated to on the record at the suppression hearing, the police arrested McCoy "the moment" they came in contact with him. Thus the People conceded that the arresting officers lacked personal knowledge of any criminal activity and that they acted without the benefit of any independent police work. Hence, the fact that McCoy fit the description of the person described in the second informant's call and that such formed the sole basis for the arresting officer's conclusion that he had probable cause to arrest McCoy is a wholly insufficient basis to support a warrantless arrest.

By the same token, we are not presented with a situation in which there is a credible or probative nexus between the first "previously reliable informant" and the second citizen informant. That is, considering all the information available to the police *at the time of the arrest* and the totality of the circumstances then, there was inadequate personal distinguishing information about the *"black male"* who attempted to sell *five pieces* of jewelry on February 18, to connect him to

the *"man and [ ] woman"* who, on February 19, attempted to sell a *large quantity* of expensive jewelry. Thus despite the connection apparently drawn between the two calls from informants by the police,[4] the two tips should not be linked in a manner that would produce in the aggregate more than a bare suspicion of criminal activity, which will not satisfy our probable cause standard.

### B

Equally important, Sergeant Gaudet, the arresting officer, specifically testified that McCoy's arrest was based on mere suspicion, and further stated that McCoy "was only [arrested] for investigation." Under the totality of the circumstances test, a reviewing court will consider the arresting officer's declarations when ascertaining the purpose of the intrusion or the arresting officer's intention, and as such we should, under that standard, consider the statements of Sergeant Gaudet. Officer Gaudet's decision to place McCoy *"under arrest for investigation,"* maj. op. at 1238, reflects the same reasoning that gave rise to the general warrant but which was appropriately rejected over 200 years ago.

### II

Finally, I wish to point out that we have never held that evidence illegally obtained can justify unconstitutional intrusions.[5] Although the evidence acquired by unconstitu-

---

3. The caller described the two individuals as a black male and a black female and noted that the male was stocky, approximately twenty-five years old, and wore a black jacket with the name "McCoy" and a depiction of a "red devil" appearing on it. The informant further related that the male was carrying a small bag and was wearing a large amount of jewelry.

4. At the suppression hearing, Sergeant Miller testified that the New Orleans police department "gets those type of calls every day."

5. It is axiomatic that the law does not sanction a view that so long as the ends justify the means, any means will do. Robert Bolt's work, *A Man For All Seasons*, provides some insight into the danger of retrospective justification. In the Bolt

play, the Lord Chancellor Thomas More speaks with his daughter and son-in-law, both of whom had urged the Lord Chancellor to arrest a man because it was widely known—but legally insupportable—that, "that man's bad." In response, Chancellor More stated:

The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal.... I'm not God. The currents and eddies of right and wrong, which you find such plain sailing, I can't navigate. I'm no voyager. But in the thickets of the law, oh, there I'm a forester.

R. Bolt, *A Man For All Seasons* at 65–66. Unconvinced, Roper charged that More would give even the devil the benefit of the laws. The Lord Chancellor agreed:

tional means might aid the prosecution in obtaining a conviction, I am unwilling to abandon binding precedent intended to assure that citizens are, in fact, free from unreasonable searches and seizures by government officers. Because the Exclusionary Rule only serves to suppress evidence and does not acquit defendants, it is inappropriate to assume that remand for retrial will not lead to a just result.

## III

In sum, I can find no set of facts in this case that would balance in favor of a finding of probable cause to support a warrantless arrest. Because I am sharply opposed to any principle of law which would allow our "process of arrest to revert ... to whispered accusations," *Draper v. United States*, 358 U.S. 307, 324, 79 S.Ct. 329, 339, 3 L.Ed.2d 327 (1959), I agree with the majority that the judgment of the court of appeals reversing the conviction of McCoy should be affirmed.

Chief Justice ROVIRA dissenting:

I agree with the majority that specific information that a particular crime has been committed is not necessary to establish probable cause to execute a warrantless arrest. The majority, however, also holds that the police did not possess probable cause to arrest Vincent T. McCoy (McCoy).[1] As a result of this decision, McCoy's conviction for aggravated robbery is reversed and the ability of the People to retry McCoy will be severely hampered. This is so because the prosecution will be prohibited from introduc-

ing probative and crucial evidence such as: (1) the testimony of the owner of the jewelry store identifying the jewelry recovered in McCoy's possession, and (2) the stolen jewelry that was found in McCoy's possession. In addition, the prosecution may not be able to introduce the gun and jewelry found in McCoy's hotel room.[2] I do not think this outcome is either required or justifiable as I believe that there was probable cause to arrest McCoy, and that evidence derived from that arrest properly was admitted at trial.

## I

On February 2, 1987, the "Pick Sadler" jewelry store in Cherry Creek was robbed at gunpoint by a young, short, stocky, black man. The robber escaped with approximately 130 pieces of jewelry worth as much as $130,000.

On February 18, 1987, Sergeant Thompson (Thompson) of the New Orleans Police Department received a telephone call from a previously reliable confidential informant that a short, stout, black man approximately 25 years of age had approached him in the New Orleans central business district and attempted to sell him five pieces of expensive gold jewelry at prices much less than the obvious value of the jewelry. The informant had over forty years of experience in the gold business and estimated that the five pieces of jewelry were worth at least $25,000. Thompson relayed this information to Sergeant Gaudet (Gaudet) of the criminal investigations bureau of the New Orleans police department.

More: Yes. What would you do? Cut a great road through the law to get after the Devil? Roper: I'd cut down every law in England to do that! More: And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? ... This country's planted thick with laws from coast to coast—man's laws, not God's— ... d'you really think you could stand upright in the winds that would blow then? ... *Yes, I'd give the Devil benefit of the law, for my own safety's sake.* *Id.* at 66. Needless to say, I see no place whatever for a discussion analyzing the *value* of incrimi-

nating evidence to the prosecution's case when the evidence is acquired unlawfully.

1. The majority admits the facts would "give rise to reasonable suspicion" to detain McCoy. Maj. op. at 1238. While there is a fine line between reasonable suspicion and probable cause, in my opinion the facts in this case cross that line.

2. The court of appeals remanded the case for a new trial, directing the trial court to determine whether the evidence discovered in the hotel room was the illegal "fruit" of McCoy's arrest.

The following day, Officer Miller (Miller) of the New Orleans police department received a telephone call from an employee of a reputable jewelry store located in the central business district of New Orleans. The caller identified himself to Miller[3] and stated that a stocky black man in his mid-twenties had just been in the store with a large amount of very expensive jewelry which he had tried to sell at a very low price. Miller testified that the employee was suspicious because of the low price the man wanted for the jewelry, and because, unlike a pawnshop, it is rare for people to attempt to sell jewelry to a jewelry store. Moreover, the employee told Miller that he could see the man standing outside the store as he was speaking to Miller and stated that the man was carrying a little bag and was wearing a large amount of jewelry and a black jacket with the word "McCoy" on it as well as a red devil on the back, that he was accompanied by a woman in a red jacket, and that they were heading towards a nearby Burger King.

Acting on this information, Miller immediately put out a radio call for a detective unit in the area. The detective who responded was Gaudet. As noted above, Gaudet knew that the previous day the police received a report in which a person with similar physical characteristics had attempted to sell expensive jewelry for very low prices in the same district in New Orleans. Accordingly, Gaudet, along with other New Orleans police officers, proceeded to the restaurant. Upon entering the restaurant, Gaudet quickly recognized McCoy and his companion and ad-

vised them that they were under arrest for investigation of possession of stolen property. At the time of the arrest, not only was McCoy wearing some jewelry, but a search incident to arrest revealed that McCoy had in his possession a pouch containing a substantial amount of jewelry and a hotel key.[4] Though McCoy declined to talk to the police, McCoy's companion made a written statement in which she stated that McCoy had robbed a jewelry store in Denver and that additional pieces of jewelry, as well as a gun, were located in a local hotel. Based on this information, the police obtained a search warrant for the hotel room and recovered a .38 caliber gun and other pieces of jewelry. The New Orleans police department then informed the Denver police department that McCoy had been taken into custody in New Orleans. Subsequently, McCoy was returned to Colorado and charged with two counts of aggravated robbery and two counts of crimes of violence.

Prior to trial, McCoy moved to suppress the introduction of evidence obtained from the arrest, arguing that the police did not have probable cause for his arrest; therefore, the evidence had been obtained in violation of his Fourth Amendment rights and must be excluded. The trial court disagreed and denied the motion. In denying the motion, the trial court found both informants reliable. As to the confidential informant, the trial court found that Thompson personally knew the informant, had relied upon him in the past and knew that the informant had forty years of experience in the gold busi-

---

3. The trial court found the employee did identify himself to Miller, though the officer could not remember the name of the employee at the suppression hearing.

4. The police recorded the jewelry that they recovered from McCoy. The report included the following pieces:

one yellow gold heavy rope chain with approximately one karat diamond; one yellow gold bracelet with three large diamonds, 20 smaller diamonds; one yellow gold ring, oval shaped with a one and two-thirds karat diamond and a one three-quarter diamond; one yellow gold necklace, 10 to 20 diamonds; one yellow gold pendant containing one large diamond and 15 smaller diamonds mounted in the center; one yellow gold chain containing a sapphire and pendant; three large rubies surrounded by ten smaller diamonds; one yellow gold necklace containing two to five small diamonds and two emeralds, one containing five diamonds; one yellow gold ring containing one large diamond; one yellow gold ring containing 12 small diamonds; one yellow gold ring containing four small diamonds and one blue sapphire; one yellow gold ring containing one large diamond and two smaller diamonds; one yellow gold bracelet with 28 diamonds; one pendant which had pearls and five small diamonds; one yellow gold mesh necklace; one yellow gold mesh bracelet; one yellow gold bracelet.

ness. With respect to the jewelry store employee, the trial court found that the employee of the jewelry store identified himself to Miller and was reliable as a citizen informant. At trial, McCoy was identified as the armed robber by both of the persons working in the jewelry store on the day of the robbery. Additionally, the owner of the jewelry store identified much of the jewelry found on McCoy and in his hotel room as jewelry taken from his store in the robbery. Subsequently, a jury found McCoy guilty on all charges, and he was sentenced to a term of 24 years and 2 days in the Department of Corrections.

## II

The law regarding probable cause is well settled and need not be reiterated. However, "we must not lose sight of the fact that a probable cause determination involves a common-sense question: what would reasonable people believe under the circumstances?" *People v. Quintero,* 657 P.2d 948, 951 (Colo.) (Rovira, J., dissenting), *cert. granted,* 463 U.S. 1206, 103 S.Ct. 3535, 77 L.Ed.2d 1386, *and cert. dismissed,* 464 U.S. 1014, 104 S.Ct. 543, 78 L.Ed.2d 719 (1983).

In determining there was no probable cause to arrest McCoy, the majority does not examine the facts and circumstances known to the arresting officers as a whole. Instead, the majority attempts to strip certain facts of their importance by considering them as independent variables. For instance, the majority first examines the information provided by the jewelry store employee and concedes that the police "had probable cause to believe that the person who offered the jewelry at the jewelry store was the same person they located at Burger King." Maj. op. at 1237. The majority next examines whether McCoy was the person involved in the two reports and assumes that there may be probable cause "to believe that McCoy was the person who had engaged in the suspicious activity on both occasions." Maj. op. at 1238. The majority then seeks to discount some of

the information known to the police officers stating that "[n]either the defendant's physical characteristics nor his attire contributes to a conclusion that a crime had been or was being committed." *Id.*

The determination of probable cause is not made in a vacuum. By necessity it requires an examination of a variety of factors *in conjunction with each other.* In this case, the arresting officer knew of two independent reports of a short, stout, black male approximately 25 years old, attempting to sell expensive jewelry at prices much less than the obvious value of the jewelry in the central business district of New Orleans. The reports were made within twenty-four hours of each other by two separate and credible sources.

The first description of McCoy was given to the police by a previous reliable confidential informant with over forty years of experience in the gold business. The informant gave Thompson a detailed description of the jewelry the man was attempting to sell as well as the man involved.

A second report corroborated the fact that a man matching the description given by the confidential informant was attempting to sell expensive jewelry at prices well below market value in the central business district of New Orleans. The second report was made by an employee of a reputable jewelry store who was so concerned by McCoy's activity that he voluntarily placed a call to the police the moment McCoy left the store. The employee identified himself to Miller and stated that he was calling the police because he did not "want to get caught in the middle of anything." Both reports to the police were made by individuals who refused to do business with McCoy because they believed the ownership of the jewelry he was attempting to sell was questionable.[5]

Based upon the two separate reports and descriptions, McCoy was recognized and arrested. The trial court found these facts and circumstances were sufficient to establish

5. In Louisiana, it is a crime to deal with stolen property. La.Rev.Stat.Ann. § 14:69 (West 1986).

probable cause to arrest McCoy, not for the armed robbery in Denver, but for the possession of stolen property.[6] I believe that the totality of this information *considered as a whole* would lead an experienced police officer, indeed even a lay person, to the reasonable belief that McCoy had committed or was committing a crime.

The majority also suggests that the fact that McCoy entered a jewelry store in the afternoon and openly attempted to sell his stolen goods undermines the suspicion that the jewelry was stolen. I find this fact unpersuasive. First, this behavior was clearly suspicious to the employee who called the police immediately after McCoy left the store. Additionally, there is little doubt that many crimes are perpetrated in the open and in broad daylight, attesting either to the boldness or to the stupidity of the perpetrators, but not to the innocence of their activities. Likewise, I am not persuaded by the majority's conclusion that the words used to arrest McCoy suggest a lack of probable cause. In the heat of an arrest, it is unlikely a police officer expends time contemplating the words used to effectuate the arrest, thus I decline to infer that the words used by a police officer in arresting an individual have any bearing on whether probable cause to arrest exists.

In executing their duties, police officers often are required to make decisions on the street based upon the totality of the information available to them at that time. Though the Fourth Amendment protects liberty interests of individuals, it also must be applied in light of the needs of law enforcement officials to protect the public. Because I believe that there was probable cause to arrest McCoy, I do not believe his Fourth Amendment rights were violated. Accordingly, I dissent.

I am authorized to say that Justice VOLLACK and Justice MULLARKEY join in the dissent.

---

6. Possession of stolen property is a crime in Louisiana. La.Rev.Stat.Ann. § 14:69 (West 1986).